Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/25/2017 09:16 PM CDT

In re Interest of Carmelo G., a child
under 18 years of age.
State of Nebraska, appellee, v.
Latika G., appellant.

___ N.W.2d ___

Filed June 2, 2017.    No. S-16-981.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.
2. **Constitutional Law: Due Process.** The determination of whether the procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.
3. **Appeal and Error.** On a question of law, an appellate court reaches a conclusion independently of the court below.
4. **Constitutional Law: Parental Rights.** The proper starting point for legal analysis when the State involves itself in family relations is always the fundamental constitutional rights of a parent.
5. **Parental Rights.** The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court.
6. **Parental Rights: Due Process.** The fundamental liberty interest of natural parents in the care, custody, and management of their children is afforded due process protection.
7. **Juvenile Courts: Parental Rights.** Neb. Rev. Stat. § 43-248(2) (Cum. Supp. 2014) allows the State to take a juvenile into custody without a warrant or order of the court when it appears the juvenile is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection. However, the parent retains a liberty interest in the continuous custody of his or her child.
8. **Parental Rights: Notice.** The State may not, in exercising its parens patriae interest, unreasonably delay in notifying a parent that the State

has taken emergency action regarding that parent's child nor unreasonably delay in providing the parent a meaningful hearing.

9. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the Separate Juvenile Court of Douglas County: Vernon Daniels, Judge. Order vacated, and cause remanded for further proceedings.

Thomas C. Riley, Douglas County Public Defender, and Zoë R. Wade for appellant.

Donald W. Kleine, Douglas County Attorney, and Paulette Merrell for appellee.

Kate E. Placzek, of Law Office of Kate E. Placzek, guardian ad litem.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Miller-Lerman, J.
### NATURE OF CASE
On January 5, 2016, the State filed a petition in the separate juvenile court of Douglas County against Carmelo G.'s biological parents, Latika G. and Deontrae H. The State alleged that Carmelo lacked parental care by reason of the fault or habits of Latika and Deontrae. On that same day, January 5, the juvenile court filed an ex parte order in which it granted the State's motion for temporary custody of Carmelo with the Department of Health and Human Services (DHHS). A protective custody hearing was held on January 21, but it was continued over many dates until it was concluded on August 2. On September 19, the juvenile court filed an order in which it ordered that Carmelo remain in the temporary custody of DHHS until further order of the court. Latika appeals. Because we conclude that Latika's procedural due process rights were

violated, we vacate the September 19 order and remand the cause for further proceedings.

## STATEMENT OF FACTS

Carmelo was born in July 2015. Latika is Carmelo's biological mother, and Deontrae is Carmelo's biological father. Prior to the filing of the petition in the present case, Carmelo was under the jurisdiction of the juvenile court from July 2015 through December 2, 2015, in case No. JV 15-1285. In that earlier case, the State filed a petition against Latika pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014). In its protective custody order filed July 15, the juvenile court noted that the State had requested continued protective custody of Carmelo by DHHS and that Latika did not resist continued protective custody. The court ordered that Carmelo was to remain in the temporary custody of DHHS, with placement to exclude the parental home. The court stated that returning Carmelo to Latika's care at that time would be contrary to his health and safety due to exigent circumstances, including the facts set forth in the affidavit for removal in that case, "as well as the mother's use of illegal drugs which impairs her ability to adequately provide for the child." It was also noted in case No. JV 15-1285 that Latika suffered from mental health issues, including bipolar disorder, schizophrenia, and depression.

On December 2, 2015, an adjudication hearing was held in case No. JV 15-1285. In an order filed on December 3, the juvenile court dismissed that case, stating that based on the evidence presented, it could not find that Carmelo was within the meaning of § 43-247(3)(a) as pled. Carmelo was returned to Latika's home on December 2.

Kathleen Aburumuh, an employee of Nebraska Families Collaborative (NFC), was the family permanency specialist assigned to work with Latika during the pendency of the initial filing against Latika in case No. JV 15-1285. During the pendency of that case, Aburumuh met with Latika a

minimum of once per month from August through December 2015 and Aburumuh worked with Latika on her case plan, which included addressing substance abuse and domestic violence issues.

Starting on December 3, 2015, following the dismissal of case No. JV 15-1285, Aburumuh continued to work with Latika through Aburumuh's position on the noncourt team at NFC. Aburumuh testified that a noncourt team consists of caseworkers "who primarily work with families where the safety threat is not large enough to remove the children, but there are still safety threats present." As a member of the noncourt team, Aburumuh would work with the family to resolve those safety threats.

Aburumuh testified that as of December 3, 2015, there were threats to the child present in Latika's home. Aburumuh testified that the threats to Carmelo's well-being were reflected in the facts that there had been two calls to law enforcement regarding domestic violence in October and November 2015 and that Latika had recently tested positive for cocaine. Aburumuh further testified that at that time, NFC felt that because Latika "was already involved in services and hadn't quite completed them, and this was a sudden turn in the case, that nobody was kind of expecting it, that it would be to her benefit to continue with services."

When Aburumuh met with Latika at Latika's home on December 3, 2015, Aburumuh presented Latika with a safety plan. Aburumuh testified that safety plans are put into place when it has been determined that without services, the child at issue is at risk of removal. The safety plan Aburumuh presented to Latika on December 3 included, inter alia, that Latika was to participate in random drug testing, to continue to participate in and complete outpatient treatment, to participate in domestic violence classes, and not to have contact with Deontrae. The December 3 safety plan further stated that Latika's brother would move into the home effective December 4 to help Latika. The plan provided

that Latika would allow random visits from her mother and her sister.

Latika's mother and Carmelo were present at the meeting on December 3, 2015. Latika's brother was briefly present, but Aburumuh did not discuss the safety plan with him or his involvement as a safety plan participant. Latika's sister, who was also identified as a safety plan participant, was not present at the meeting.

Aburumuh was the only person to sign the December 3, 2015, safety plan. Latika and the other safety plan participants did not sign it. Aburumuh testified that Latika verbally agreed to the December 3 safety plan. Aburumuh testified that the safety plan was not signed because she needed to correct the name of Latika's brother, who was a plan participant. Aburumuh testified that she later attempted to have Latika sign the correct safety plan but was unable to meet up with her.

On December 20, 2015, reports of domestic violence between Latika and Deontrae were made to law enforcement. On December 29, DHHS was made aware of the domestic violence report. As a result of learning of the domestic violence report, on December 31, Aburumuh and Kevin Peatrowsky, who is a child and family services specialist with DHHS, met with Latika in order to investigate the domestic violence allegation of December 20. Peatrowsky testified Latika told him that she and Deontrae had gotten into an argument that resulted in a physical fight and that during the argument, Deontrae had broken a picture frame over Latika's head and a bowl of cereal was spilled. Peatrowsky testified that he understood that there had been physical violence between Latika and Deontrae "[m]ore than two times in the past year . . . ."

On December 31, 2015, Peatrowsky presented Latika with an updated safety plan. The December 31 safety plan included the services and conditions outlined in the December 3 safety plan. The December 31 safety plan further stated that Carmelo was "not currently safe staying in the family home of Latika"

and that he would "now stay with the maternal aunt . . . in order to ensure that the safety of the child is secured." The December 31 safety plan was signed by all the safety plan participants.

On January 5, 2016, the State filed a petition against Latika pursuant to § 43-247(3)(a) (Supp. 2015) in which the State alleged that Carmelo lacked proper parental care by reason of the fault or habits of Latika. Specifically, the State alleged in the petition that (1) Latika's use of alcohol or drugs places Carmelo at risk; (2) Latika has participated in domestic violence with Deontrae; (3) Latika has failed to work with an agreed-upon NFC plan; (4) on or about December 20, 2015, Latika was involved in a domestic violence incident with Deontrae in which law enforcement was called to the home where Carmelo resides; (5) on December 31, Latika admitted to an NFC employee that she had willingly let Denotrae into her home on December 20; and (6) due to the above allegations, Carmelo is at risk.

On that same day, January 5, 2016, the juvenile court filed an ex parte order in which it granted immediate temporary custody of Carmelo to DHHS. The court stated that based upon its findings of drug use and domestic violence, Carmelo was seriously endangered in his surroundings. The court further stated that continuation of Carmelo in his home would be contrary to his health, safety, or welfare and that immediate removal appeared to be necessary for Carmelo's protection. The court further noted that reasonable efforts were made to prevent removal or that exigent circumstances precluded reasonable efforts from being made. Such reasonable efforts included a "[s]afety plan, drug testing, [i]nte[n]sive [o]utpatient [t]reatment, [and] IFP services." Based on the foregoing, the court ordered that DHHS was to take temporary custody of Carmelo, which DHHS did. The ex parte order set a protective custody hearing for January 12, 2016.

The State moved for Carmelo's continued detention, with placement to exclude the parental home. Carmelo's guardian

ad litem and DHHS joined in the motion. Latika and Deontrae resisted the continued detention. At some point during these proceedings, Deontrae no longer resisted the continued detention, and he is not a part of this appeal.

On January 7, 2016, the juvenile court judge recused himself because he was the judge who had presided over the proceedings in case No. JV 15-1285. The protective custody hearing was reset for January 21.

The protective custody hearing was held on January 21, 2016, but it was continued for a further evidentiary hearing. Continued evidentiary hearings were held on February 10 and 24, March 10, May 13, and August 2. Each continuance order stated that the hearing was continued "due to insufficient time," except for the order continuing the hearing from May 13 to August 2, in which the court stated that "the county attorney moved for a continuance for the reason that the witness is on vacation." The parties did not object to the continuances.

Aburumuh and Peatrowsky testified at the protective custody hearing. The juvenile court received eight exhibits, including the December 3, 2015, safety plan; the December 31, 2015, safety plan; certain certified copies of orders from case No. JV 15-1285; results of Latika's drug tests; and Aburumuh's affidavit for removal dated January 5, 2015.

The protective custody hearing was concluded on August 2, 2016, and the juvenile court filed a protective custody order on September 19, in which it sustained the State's motion for continued temporary custody. The court stated that by a preponderance of the evidence, it found that exigent circumstances existed, reasonable efforts were not required to prevent removal of Carmelo from the home of Latika, and it would be contrary to Carmelo's health and safety for Carmelo to be returned home. The court determined that it was in Carmelo's best interests, safety, and welfare to remain in the temporary custody of DHHS.

Latika appeals.

## ASSIGNMENTS OF ERROR

Latika assigns, restated, that (1) she was denied due process due to the unreasonable delay of more than 8 months between the issuance of the ex parte custody order and that of the protective custody order continuing Carmelo's detention outside the parental home pending adjudication and (2) she was denied due process when the juvenile court determined that continuing Carmelo's detention was necessary based on Latika's noncompliance with the December 3, 2015, safety plan because the plan was invalid and coercive.

## STANDARDS OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Noah B. et al.*, 295 Neb. 764, 891 N.W.2d 109 (2017).

[2,3] The determination of whether the procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law. *In re Interest of Joseph S. et al.*, 288 Neb. 463, 849 N.W.2d 468 (2014). On a question of law, an appellate court reaches a conclusion independently of the court below. *In re Interest of Noah B. et al., supra*.

## ANALYSIS

In her first assignment of error, Latika claims that her procedural due process rights were violated by the unreasonable delay of more than 8 months between the issuance of the ex parte order for immediate temporary custody and that of the protective custody order, sometimes referred to as the "detention order." Although Latika's objections to the process tended to focus on the initial removal of Carmelo, the court recognized on the record that the duration of the proceedings had been prolonged. We find merit to Latika's assignment of error claiming a denial of due process.

[4-6] The proper starting point for legal analysis when the State involves itself in family relations is always the

fundamental constitutional rights of a parent. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court. *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014), citing *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection. *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007); *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). Such due process rights include the right to be free from an unreasonable delay in providing a parent a meaningful hearing after the entry of an ex parte temporary custody order. See *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998). We have previously described the three-stage analysis employed for a claim that one is being deprived of a liberty interest without due process of law. See, *Sherman T. v. Karyn N.*, 286 Neb. 468, 837 N.W.2d 746 (2013); *In re Interest of R.G., supra*. We have undertaken that analysis.

[7,8] Neb. Rev. Stat. § 43-248(2) (Cum. Supp. 2014) allows the State to take a juvenile into custody without a warrant or order of the court when it appears the juvenile "is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection." However, the parent retains a liberty interest in the continuous custody of his or her child. *In re Interest of Mainor T. & Estela T., supra*. An ex parte order authorizing temporary custody with DHHS is permitted because of its short duration and the requirement of further action by the State before custody can be continued. *Id*. See, also, *In re Interest of R.G., supra*. But "the State may not, in exercising its parens patriae interest, unreasonably delay in notifying a parent that the State has taken emergency action regarding that parent's child

*nor unreasonably delay in providing the parent a meaningful hearing.*" *In re Interest of R.G.*, 238 Neb. at 419, 470 N.W.2d at 790 (emphasis supplied). Therefore, following the issuance of an ex parte order for temporary immediate custody, "[a] prompt detention hearing is required in order to protect the parent against the risk of an erroneous deprivation of his or her parental interests." *In re Interest of Mainor T. & Estela T.*, 267 Neb. at 246, 674 N.W.2d at 456. See, also, *In re Interest of R.G., supra*.

In the present case, the State filed its petition on January 5, 2016, and on that same day, the juvenile court filed the ex parte order for immediate custody. DHHS took custody of Carmelo. The State moved for Carmelo's continued detention. The protective custody hearing was set for January 12, which was 7 days after the filing of the ex parte order. The judge then recused himself, and the protective custody hearing was rescheduled for January 21. The hearing began on January 21, which was 16 days following the entry of the ex parte order. Receipt of evidence could not be completed in the time allotted for the hearing, and this hearing and several subsequent hearings were continued. Hearings were held on February 10 and 24, March 10, May 13, and August 2. The hearing concluded on August 2. The juvenile court filed its protective custody order on September 19, which was more than 8 months after the ex parte order for immediate custody was filed.

Latika argues that the more than 8-month delay between the entry of the ex parte order and that of the protective custody order was unreasonable and violated her due process rights. In contrast, Carmelo's guardian ad litem and the State contend that the delay between the issuance of the ex parte order and that of the protective custody order was not unreasonable, because Latika received notice for each of the hearings and received services and visitation with Carmelo during this period of time. The guardian ad litem and the State also assert that "the elapsed time was for the purpose of providing

[Latika] a meaningful opportunity to be heard." Brief for appellee guardian ad litem at 14.

We disagree with the argument of the guardian ad litem and the State to the effect that the period of delay was a benefit to Latika and Carmelo. Instead, we determine that the more than 8-month delay between the entry of the ex parte order and that of the protective custody order was unreasonable and resulted in a violation of Latika's procedural due process rights. As stated above, an ex parte order authorizing temporary custody with DHHS is permitted because of its short duration, and a prompt detention hearing is required in order to protect the parent against the risk of an erroneous deprivation of his or her parental interests. See *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004).

In *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998), we recognized that parents have due process rights to be free from an unreasonable delay in providing the parents a meaningful hearing after an ex parte order for immediate custody is filed. In *In re Interest of R.G.*, we concluded that the mother's due process rights were not violated by a 14-day delay between the entry of an ex parte order and that of a detention order when she was given an opportunity to be heard at the detention hearing and was allowed to visit her children in the interim. We cautioned, however, that "the 14 days elapsing between the entry of the ex parte order and the hearing poise the procedures employed in this case on the brink of unreasonableness." *Id*. at 423, 470 N.W.2d at 792.

In this case, the detention hearing commenced on January 21, 2016, which was 16 days after the ex parte order was filed. This is 2 days more than the time that elapsed between the entry of the ex parte order and the hearing in *In re Interest of R.G.*, and in that case, we cautioned that the 14-day period left the procedures employed "on the brink of unreasonableness." 238 Neb. at 423, 420 N.W.2d at 792. The protective custody

hearing in this case was continued over a period of several months, until it finally concluded on August 2. Thereafter, the juvenile court filed its protective custody order on September 19, which was more than 8 months after the ex parte order was filed. The allowance of such an ex parte temporary action is a reasonable reaction to a perceived emergency situation. See *In re Interest of R.G., supra*. However, in exercising its parens patriae interest and taking such ex parte temporary action, the State may not unreasonably delay in providing the parent a meaningful hearing. See *id*. This is because a parent has a liberty interest in raising his or her child, a concept which encompasses the child's custody, care, and control. See *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014). The more than 8-month delay in this case between the filing of the ex parte order and that of the protective custody order is too long a duration and results in interference with Latika's liberty interest in raising Carmelo.

This court is well aware of the many challenges involved in scheduling and completing evidentiary hearings in jurisdictions with crowded dockets, including the reality that lawyers are sometimes unable to complete their evidence in the time allotted and continuances are necessary. But despite these challenges, we have recognized that the juvenile court is responsible for managing its docket. That responsibility includes providing prompt detention hearings on an ex parte protective custody order, and in this case, we cannot find that the protective custody hearing was initiated or resolved promptly. The delay in this case was unreasonable, and Latika's procedural due process rights were violated because of this unreasonable delay.

We note that the parties did not directly object to the continuances of the hearing. However, this does not impact our analysis. In *In re Interest of D.M.B.*, 240 Neb. 349, 355-56, 481 N.W.2d 905, 911 (1992), we stated that "[a] delay of 8 months between the time a child is 'temporarily' taken from the child's parent until the child and parent are given the

evidentiary safeguards of an adjudication hearing cannot be condoned, *even when, as here, the parties agreed to repeated continuances*." (Emphasis supplied.) We similarly agree in the instant case that the 8-month delay between the issuance of the ex parte order and that of the protective custody order cannot be condoned, even though the parties did not object to the repeated continuances of the protective custody hearing.

We determine that Latika's procedural due process rights were violated. Therefore, we vacate the September 19, 2016, order of the juvenile court and remand the cause for further proceedings.

[9] Because our determination of Latika's first assignment of error is dispositive, we do not reach her second assignment of error. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Medicine Creek v. Middle Republican NRD, ante* p. 1, 892 N.W.2d 74 (2017).

## CONCLUSION

We conclude that Latika's procedural due process rights were violated by the unreasonable delay of more than 8 months between the filing of the ex parte order for immediate temporary custody and the filing of the protective custody order. Therefore, we vacate the September 19, 2016, temporary protective order of the juvenile court and remand the cause for further proceedings.

Order vacated, and cause remanded
for further proceedings.