IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF OZMOHSIZ M.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF OZMOHSIZ M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DEYANIRA M., APPELLANT.


Filed November 21, 2017.    No. A-17-089.


Appeal from the County Court for Scotts Bluff County: KRISTEN D. MICKEY, Judge. Affirmed.

Bernard J. Straetker, Scotts Bluff County Public Defender, for appellant.

Danielle Larson, Deputy Scotts Bluff County Attorney, for appellee.


MOORE, Chief Judge, and INBODY and BISHOP, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Deyanira M. appeals from the order of the county court for Scotts Bluff County, sitting as a juvenile court, which terminated her parental rights to her minor child, Ozmohsiz M. (Oz). Finding no error, we affirm.

### BACKGROUND

Deyanira is the mother of Oz, born in December 2014. She was 21 years old at the time of Oz' birth. She is also the mother of a younger child born in March 2016, but the present case only

- 1 -

involves the termination of Deyanira's parental rights with respect to Oz. Deyanira tested positive for marijuana prior to Oz' birth, and after his meconium tested positive for THC and methamphetamines, he was removed from Deyanira's care on December 18, 2014. Oz has remained in out-of-home placement since that time. The parental rights of Oz' father were terminated during the course of these proceedings. Because the fathers of Deyanira's children are not involved in the present appeal, we do not discuss them further, except as necessary to the resolution of Deyanira's appeal.

On December 18, 2014, the State filed a petition in the juvenile court alleging that Oz was a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013) and lacked proper parental care due to the faults or habits of his parent, guardian, or custodian, in that his "parents' use of controlled substances" placed him at risk for harm. The State also filed a motion and affidavit for temporary custody, which the court granted on that same date, placing Oz in the temporary custody of the Nebraska Department of Health and Human Services (the Department).

On February 24, 2015, the juvenile court entered an order adjudicating Oz as a child under § 43-247(3)(a). The court placed Oz in the Department's custody, ordered that the parents be drug tested immediately following the hearing, ordered the Department to pay for all services related to the petition that the parents cannot afford, and ordered that the Department pay for psychological and substance abuse evaluations for both parents. The court adopted the Department's case plan and ordered the parties to comply with its terms. The case plan had a primary permanency objective of reunification with a concurrent plan of adoption. As related to Deyanira, the only goal of the case plan was that she establish a safe, stable, and nurturing living environment free from illegal substances. The strategies to accomplish that goal were that she remain free from any and all illegal substances; obtain and maintain safe and stable housing; participate in the early development network for Oz; complete a substance evaluation and follow all recommendations; sign any releases requested by the Department and attend monthly team meetings; obtain and maintain stable employment; complete "Circle of Security;" attend NA at least 1 time per week; and work with family support on budgeting, scheduling, healthy communication, parenting, and nurturing.

Following a review hearing on May 5, 2015, the court entered an order continuing all previous orders. The court ordered Deyanira to undergo both a substance abuse and a mental health evaluation and ordered the permanency goal changed to adoption with an alternate concurrent goal of reunification. The court adopted the case plan offered by the Department, which remained identical to the previously adopted case plan, and ordered the parties to comply with its terms.

Another review hearing was held on August 11, 2015. Following this hearing, the juvenile court ordered Oz to undergo testing at "the Genetics Clinic," random drug testing "to include PBT's" for Deyanira, and "Child Welfare conferencing." The court also ordered Deyanira to schedule a psychological evaluation per the case plan, continued the previous permanency goals, and adopted the Department's case plan. The case plan remained substantially similar to the previous plans, only removing the requirement to complete a substance abuse evaluation; adding requirements that Deyanira attend individual appointments "at PMHC," attend and actively participate in "IOP," complete a psychological evaluation, and maintain her then current employment. The court continued the permanency goals again following a review hearing on October 27. The goal and strategies of the case plan adopted on that date with respect to Deyanira

were identical to those of the previous case plan. On January 12, 2016, the court ordered the permanency goals be changed to a primary goal of adoption and a secondary goal of reunification. The case plan adopted on that date remained unchanged with respect to Deyanira.

On January 13, 2016, the State filed the first motion to terminate Deyanira's parental rights. The State alleged that termination was appropriate under Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 2016) and that termination was in Oz' best interests. On March 1, Deyanira entered a denial to the motion. The juvenile court ordered that Deyanira be drug tested immediately following the proceedings and that no comments about or photographs of Oz be placed on any type of social media.

The first termination hearing was held before the juvenile court on April 19, 2016. On May 27, the court entered an order dismissing the motion to terminate Deyanira's parental rights. In finding insufficient evidence to terminate Deyanira's parental rights, the court stated as follows:

> The court finds that although there is evidence that the mother either failed or refused to provide necessary parental care and protection until relatively recently, including exposing the child to methamphetamines and marijuana, inconsistency in utilizing services, missed and/or cancelled visitations, conflict with the father during visitations, conflict with the foster mother, positive drug tests and/or refused tests, unstable housing, failure to timely complete a psychological evaluation, failure to complete an aftercare program after intensive outpatient drug treatment, a vacillating level of interest in the case plan, delayed compliance with the case plan, and continuing relationships with known drug users including the biological father, the record also demonstrates the mother's substantial recent progress in obtaining steady employment, completion of intensive outpatient treatment, no positive drug tests since September 2015, vastly improved attendance for visitations since October 2015, evidence of a strong bond between the mother and the child, and in general, an increased level of commitment by the mother to parenting the child. At the time of trial, the testimony revealed no immediate concerns about the mother's ability to parent the child, but rather an understandable concern that the mother may not sustain the progress observed most recently. Specifically, [a witness] testified about a concerning historical pattern of progressing in one area and regressing in another. The State's brief expresses this same concern. . . . That precise concern [whether the mother could maintain stability if visits were again increased], if validated by the mother's relapse into behaviors that led to the filing of the [termination motion], may yet become the course of another motion to terminate parental rights. Thus, it remains to be seen whether the mother will demonstrate sustained commitment, hard work, perseverance, and continued improvement in parenting skills. In the court's opinion, however, despite the historical undesirable evidence summarized above, the present facts demonstrate sufficient progress to deny termination on the basis that, at this time, there is not clear and convincing evidence to terminate the mother's parental rights on either of the alleged grounds. In addition, in view of the mother's rehabilitative efforts, the court further finds that termination is not presently in the child's best interests.

On August 11, 2016, the State filed a second motion to terminate Deyanira's parental rights, alleging that termination was proper under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) and that termination of her parental rights was in Oz' best interests. Deyanira entered a denial to the allegations on August 23, 2016, and the juvenile court ordered that she be drug tested immediately following the proceedings. The case plan goal and strategies remained the same.

The second termination trial was held before the juvenile court on November 29, 2016. The court heard testimony from several witnesses, including Deyanira, Oz' foster mother, an alcohol and drug counselor, and various case managers and support workers, and received various documentary exhibits into evidence.

Services provided by the Department to Deyanira during this case have included supervised visitation, substance abuse evaluation and drug testing, family support, parenting education courses, relative placement, gas and other vouchers, and therapy. Testimony from case managers and support workers reflected a pattern of cyclical compliance and regression in terms of Deyanira's overall progress toward the goal of her case plan and her compliance with and utilization of the services provided.

Rodney Matilainen, a licensed alcohol and drug counselor, completed 2 substance abuse evaluations of Deyanira. The first evaluation, completed on October 8, 2015, diagnosed "substance dependence," which is now referred to as "substance use disorder," based on her use of alcohol, methamphetamine, and marijuana. Deyanira's treatment plan included intensive outpatient (IOP) treatment, followed by participation in a "continued care group," and at least 2 NA/AA meetings per week. Deyanira "successfully" completed the IOP program on January 25th, 2016, although she only completed 3 out of the 5 steps of the program. Deyanira did not complete the continued care program, which Matilainen testified helps people maintain sobriety and avoid future relapses. Matilainen completed a second substance abuse evaluation of Deyanira on October 10, 2016, diagnosing the same substance use disorders. Matilainen referred Deyanira to a dual-diagnosis therapist because she mentioned "issues with bipolar and depression" in addition to her substance use issues.

Between December 2014 and November 28, 2016, out of the 288 drug tests offered to Deyanira, 213 were "positive, no-shows, or refusals." She has tested positive most consistently for "THC," though she has also tested positive for amphetamines, methamphetamines, "benzos," or opiates on a few occasions. When she tested positive for opiates, she did have a prescription for pain medication for her back. Deyanira began passing drug tests in October 2015 after learning she was pregnant with Oz' younger sibling, but she had a relapse in July 2016 after losing a job.

Deyanira did not complete a psychological evaluation although she was in the process of doing so at the time of the second termination hearing. Deyanira reported to a case manager that she had anxiety and depression and that she would drink or use marijuana as a coping skill. She did not seek mental health counseling, although the Department would have paid for mental health services, until shortly before the second termination hearing. Deyanira attended her first appointment with the dual diagnosis counselor on November 2, 2016, but she missed a second appointment on November 15 as well as a medication appointment.

Deputy Robert Hackett of the Scotts Bluff County Sheriff's Office was dispatched to Deyanira's residence on August 3, 2016 in connection with a domestic disturbance between

Deyanira and her then current boyfriend, the father of her youngest child. Deyanira inflicted defensive wounds on the boyfriend who she reported pushed her down, slapped her, and held a pillow over her head until she could not breathe. Deyanira admitted to Hackett that she had intentionally swerved her vehicle toward the boyfriend when he was walking away from the residence. Hackett observed scratches and abrasions on Deyanira's face and throat. Hackett arrested the boyfriend following his investigation.

There was evidence about additional concerns with Deyanira's relationships. According to a family support worker, Deyanira and Oz' father would fight and argue and he was verbally abusive toward her. Deyanira allowed Oz' father to reside with her when he was released from jail, during a time the father was consistently testing positive for methamphetamines, although she did remove him from her home after a case worker discussed the matter with her. There were also concerns about Deyanira's relationship with the father of the youngest child because Deyanira often chose him over her child.

Oz has been placed with his great uncle and aunt since 2 weeks after his birth. Deyanira's younger child has also been placed there. Oz' foster mother testified about his health and behavioral issues. When Oz was first placed with her, he had breathing problems, and he continued to have "some issues" with his "sinuses and stuff" at the time of the second termination trial. Also, Oz has been diagnosed with fetal alcohol syndrome, which according to his foster mother, causes him to be "real impulsive" and "a ball of energy." The foster mother testified that Oz needs a consistent routine with lots of repetition because he otherwise "gets real impulsive" and will hit, bite, throw things, and knock over furniture. Oz is also aggressive toward his younger sibling. The foster mother has observed Oz hitting, having a temper tantrum, and requiring a lot of redirection after returning from visits with Deyanira. The foster mother felt Deyanira has a lot of potential to be a good mother, but she testified that Deyanira has not been consistent in parenting Oz.

Deyanira lived with the foster parents in an apartment in the basement of their residence for a couple of months in the spring of 2016. She paid rent of $200. The foster parents hoped to provide Deyanira some stability so she could maintain her employment, obtain a vehicle, and find her own residence. According to the foster mother, the arrangement worked well initially, but after a couple of weeks, Deyanira "regressed" and wanted to "sleep all the time." Deyanira did not obtain a vehicle and quit her job while living with the foster parents. They asked Deyanira to leave because at some point, she began to get upset and say the foster mother was "picking at her" when the foster mother asked for her assistance with the children. During this time, Deyanira would interact only occasionally with the children outside of supervised visits, which were held in the basement apartment. However, she would help bathe Oz and get him ready for bed.

According to the foster mother, Deyanira has not consistently provided financial support for Oz. Initially, Deyanira provided diapers, clothes, and wipes for Oz, but her provision of such items has "tapered off" over time. She did purchase food for Oz when she lived with the foster parents. The foster mother has purchased birthday and Christmas presents for Oz and allowed Deyanira to give them to him herself.

Between December 2014 and mid-November 2016, Deyanira attended 197 out of the 282 visits with Oz she was offered. Initially, Deyanira would cancel visits for work, illness, or because she was tired. In August 2015, Deyanira attended visits more consistently, which coincided with

Oz' father no being longer present, the permanency goal changing to adoption, and Deyanira learning she was pregnant again. Deyanira's visits were initially supervised but had become semisupervised by the end of June 2016. On July 29, Deyanira was to have her first overnight visit with Oz since his removal, but the visit did not occur because Deyanira tested positive for methamphetamine, amphetamines, and THC. Deyanira's children also had "positive hair follicle tests." According to Deyanira, she did not smoke methamphetamine herself at that time but took the children into a residence where it was being smoked by someone else.

There was evidence about concerns with Deyanira's parenting during visits she attended. Deyanira was often very tired during visits and sometimes Oz or the family support worker would have to wake her. At other times, Deyanira would try to put Oz to sleep as soon as the visit started because she was so tired. The family support worker felt this issue was worse near the end of Deyanira's pregnancy with the younger child. After becoming pregnant, Deyanira was more prone to "get upset and snap" at Oz during visits. The support worker also noted Oz' breathing issues and testified that sometimes Deyanira would smoke cigarettes during visits. Most of the time during visits Deyanira "was fine, friendly;" she was sometimes receptive to suggestions and redirection but often defensive. Deyanira did not come to visits prepared with supplies such as diapers, wipes, or food. The family support worker never felt Deyanira could consistently parent without assistance.

There was evidence about Deyanira's employment, housing, and transportation, in addition to the testimony of the foster mother on these issues noted above. Deyanira did not have consistent employment during this case, working at various fast food restaurants, Wal-Mart, and other jobs. At the time of the second termination hearing, Deyanira was employed at a beef jerky plant, where she had been working since November 4, 2016. Deyanira has lived in 11 different residences during this case, often staying with family members. She did not secure her own housing, despite having a housing voucher and assistance from a family support worker, until January 2016, but she lost that housing in July after losing a job and falling behind on her rent. At the time of the second termination hearing, Deyanira was living in a hotel. Although she was without transportation at various points during this case, Deyanira had a car at the time of the second termination hearing.

One case worker testified that termination of Deyanira's parental rights would be in Oz' best interests, citing "the progression and regression that has occurred on the case," Oz' time in out-of-home care, and his need for consistency as heightened by his behavioral problems. She also expressed concern about Oz' behavior toward his younger sibling, Deyanira's ability to parent both children together, and Deyanira's failure to address her mental health issues. She noted that over the pendency of this case Deyanira has not addressed her mental health or completed a psychological evaluation, remained free from illegal substances, consistently maintained employment, or maintained safe and stable housing. Deyanira did attend monthly team meetings, and she participated in Oz' early development network review. She was nearing completion of the Circle of Security class, but she had waited until October 2016 to begin working on that element of the case plan. She also completed IOP but did not attend her individual appointments. She obtained an NA sponsor but did not continue with any NA or AA meetings after completing IOP. Deyanira did not complete a written budget until shortly before the second termination hearing.

The case worker stated that Deyanira had "not really" worked on scheduling and was to attend a class on communication in December because she missed an earlier scheduled date. The case worker noted ongoing concerns about the individuals Deyanira associates with, Deyanira's understanding of Oz' need for consistency and consequences for his behaviors, and her ability to handle external stress factors in a way that allows her to meet Oz' needs without placing him in a harmful situation. Another case worker who testified noted her overall impression of cyclical behavior by Deyanira, by which she meant Deyanira's inability to "maintain all of the elements necessary in order to meet the goal." This case worker explained that Deyanira was unable to continuously maintain multiple elements of the case plan at once and that whenever she achieved one element of a case plan, other elements would be missing.

Myrna Hernandez, who works for Panhandle Public Health under the "Healthy Families America program," testified on Deyanira's behalf. Hernandez began working with Deyanira in August 2014, assisting her in obtaining prenatal care when she was pregnant with Oz and preparing her for his birth. Hernandez had one home visit with Deyanira prior to Oz' removal from Deyanira's care. After that, Hernandez's assistance was limited somewhat because the program requires the presence of a child, either unborn or in the home, but she kept the file open until March 27, 2015. Hernandez began helping Deyanira again in September 2015 due to Deyanira's subsequent pregnancy. According to Hernandez, Deyanira has "really improved" in terms of being cooperative, "taking direction," and "trying to . . . grow." Hernandez was trained and certified to administer the "Circle of Security parenting class," and at the time of the second termination hearing, Deyanira had completed 5 out of 8 units of the class. Hernandez has had opportunities to attend visits between Deyanira and both of her children since the youngest child has been in the court system. Based on her observations during visits and her work with Deyanira, she testified that there is a bond between Deyanira and Oz and that Deyanira has made progress in her ability to parent.

Deyanira's sister also testified on Deyanira's behalf. During the pendency of this case, Deyanira has resided with her sister on occasion, and during those times, the sister was able to observe Deyanira's interactions during visits held at the sister's residence. The sister testified that there is a bond between Deyanira and Oz and that Deyanira made progress in her ability to appropriately parent Oz.

Deyanira attributed her lack of progress at the beginning of the case to her immaturity, drug use, and relationships. Deyanira described her relationship with Oz. She testified that while she and Oz did not initially have a good bond, they now had "more of a bond than [they] ever did," that he is excited to see her, and that he comes to her for things. She agreed that Oz has behavioral issues and noted strategies she has utilized when he cusses at her or calls her names. She testified to her belief that she has made progress in her parenting ability, noted that having her own car would make it easier to "keep up on everything," and stated that she would be in a position to care for both of her children once she had a stable home. Deyanira indicated that she was on a waiting list for a 2 bedroom apartment which would be available in December. She stated that although she was approved for a 1 bedroom apartment, she could afford a 2 bedroom. Deyanira did not expect Oz to wait long for her to achieve stability and testified, "I am trying the best so that I can get a home for my boys." She was not in a relationship at the time of the hearing and testified that

she was "just focused on [her] kids." She agreed that she had never worked to address "healthy relationships" but that she needed to do so. Deyanira attributed her relapse and use of alcohol and marijuana after the first termination trial to the stress of losing her job and being behind on her rent. And, as noted above, she claimed that she did not use methamphetamine at that time but that she had the boys around someone else who was smoking it.

On January 3, 2017, the juvenile court entered an order terminating Deyanira's parental rights to Oz. The court found that the State proved grounds for termination under § 43-292(2), (4), (6), and (7). With respect to § 43-292(2), (4), and (6), the court noted that although Deyanira continued to attend visits, she also continued to struggle in the same areas that were concerning in the first termination trial, including stable housing, consistent employment, sustained sobriety, healthy relationships, and performing the strategies of the case plan. The court stated further:

> The evidence in this case shows the mother has been unable to maintain a life consistently free of illegal substances. Her housing has been unstable, and she has moved approximately 11 times in the span of time this case has been open. She chooses to engage in relationships that are unhealthy and violent. She has failed to maintain stable employment, has failed to address her mental health needs, and failed to complete the requisite aftercare program as a part of the substance abuse treatment. According to the testimony of [a witness], the mother has developed little to no insight into the importance that a substance-free lifestyle has in relation to parenting a child. To date, the mother has demonstrated an inability to make steady, uninterrupted improvement in all of the necessary aspects required to properly parent this child. She has never had overnight visits with this child, and just before she was scheduled to have her first such overnight visit in July 2016, she tested positive for methamphetamine. The evidence further demonstrates the child harbors aggression toward the mother, and at his young age curses at her. The lack of improvement in her parenting skills and absence of evidence showing a beneficial relationship with the child is unfortunate, but shows the cyclical pattern of progression and regression in the various aspects of parenting identified in the first [termination] hearing continues to be the pattern since that time. Thus, a finding by this court that clear and convincing evidence to prove each of the statutory factors set forth in the motion [in addition to § 43-292(7)] is warranted.

The court also found that termination of Deyanira's parental rights was in Oz' best interests. Deyanira appeals.

## ASSIGNMENTS OF ERROR

Deyanira asserts that the juvenile court erred in finding that the State had established by clear and convincing evidence (1) the 4 statutory grounds set out in the second motion to terminate her parental rights and (2) that termination of her parental rights was in the best interests of Oz.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Carmelo G.*, 296 Neb. 805, 896 N.W.2d 902 (2017). When the evidence is in conflict, however, an appellate court may give weight

to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016).

ANALYSIS

*Statutory Grounds for Termination.*

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D.*, 289 Neb. 763, 857 N.W.2d 323 (2015).

In this case, the juvenile court found grounds for termination of Deyanira's parental rights under § 43-292(2), (4), (6), and (7). Deyanira asserts that the court erred in finding clear and convincing evidence to support termination of her parental rights under all 4 subsections. Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Deyanira's parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of her parental rights exists under § 43-292(7).

Section 43-292(7) provides grounds for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Deyanira argues that before a finding can be made justifying termination of parental rights under § 43-292(7), the State must also establish that the parent is unfit. She argues that she has the capacity to be a good parent for Oz and that any parental unfitness as it relates to this statutory ground was not established by clear and convincing evidence. Contrary to Deyanira's assertions, § 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). However, Deyanira is correct that in addition to establishing a statutory ground for termination of parental rights by clear and convincing evidence, the State must also show that termination is in the child's best interests and that the parent is unfit. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). We address Deyanira's arguments regarding best interests and parental fitness below.

Oz was removed from Deyanira's care on December 18, 2014 and has been in an out-of-home placement continuously since that time. The first motion to terminate Deyanira's parental rights, filed on January 13, 2016, alleged termination was proper under § 43-292(2) and (6) and did not include allegations under § 43-292(7). The second motion to terminate parental rights, adding allegations under § 43-292(4) and (7), was filed on August 11. By the time of the termination hearing on the second motion on November 29, Oz had been in an out-of-home placement for more than 23 months. When the termination order was entered on January 3, 2017, Oz had been in out-of-home placement for over 24 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Deyanira's parental rights under § 43-292(7) were proven by sufficient evidence.

We do not need to consider whether termination of Deyanira's parental rights was proper pursuant to § 43-292(2), (4), or (6) since any one of the 11 statutory grounds identified in § 43-292 can serve as the basis for the termination of parental rights when there is also clear and convincing evidence that termination is in the children's best interests. See *In re Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2), (4), and (6) in our analysis of best interests. Generally, when termination of parental rights is sought under subsections of § 43-292 other than subsection (7), the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of Mya C.*, 23 Neb. App. 383, 872 N.W.2d 56 (2015).

*Best Interests and Parental Unfitness.*

Deyanira asserts that the juvenile court erred in finding that termination of her parental rights was in the best interests of Oz.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S., supra.* A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Deyanira was provided with many services throughout this case, including supervised visitation, substance abuse evaluation and drug testing, family support, education, various vouchers, and early development network services for Oz. She has successfully achieved and maintained only a few of the strategies of the case plan aimed at helping her reach the goal of establishing and maintaining a safe, stable, and nurturing living environment free from illegal substances. As noted by several witnesses, Deyanira has exhibited a cyclical pattern of progression and regression, seeming unable to maintain long-term success in the various strategies of her case plan. Much of the progress she had made at the time of the first termination trial, which prevented the juvenile court from terminating her parental rights at that time, was lost in the months following the first trial. And, much of the progress noted at the time of the second termination trial had been achieved only shortly before that hearing. In sum, the Department provided Deyanira with numerous appropriate services and with a reasonable time to rehabilitate herself. The record shows that Deyanira relapses in times of stress, both in terms of her substance use and in other areas of

her life such as employment and housing. She has not addressed her mental health needs and was only in the process of completing a psychological evaluation at the time of the second termination hearing. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). We conclude that the State showed by clear and convincing evidence that termination of Deyanira's parental rights was in the best interests of Oz.

## CONCLUSION

The juvenile court did not err in terminating Deyanira's parental rights to Oz.

AFFIRMED.