IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF HANNAH W. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF HANNAH W. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ROSE U., APPELLANT, AND KEVIN W., APPELLEE.

Filed August 21, 2018.    Nos. A-17-1311 through A-17-1313.

Appeal from the County Court for Buffalo County: GERALD R. JORGENSEN, JR., Judge. Affirmed.

Charles D. Brewster, of Anderson, Klein, Brewster & Brandt, for appellant.

Mandi J. Amy, Deputy Buffalo County Attorney, for appellee State of Nebraska.

Tana Fye, of Fye Law Office, for appellee Kevin W.

Kane M. Ramsey, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., guardian ad litem.

PIRTLE, RIEDMANN, and WELCH, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

The county court for Buffalo County, sitting as a juvenile court, terminated the parental rights of Rose U. and Kevin W. to their three minor children. We affirm the termination of Rose's parental rights because we conclude that the State proved by clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interests of the children.

- 1 -

We also find that Kevin did not properly cross-appeal and therefore affirm termination of his parental rights as well.

## II. BACKGROUND

Rose and Kevin are the parents of three minor children: Hannah W., born in October 2011; Ethan W., born in October 2013; and Abigail W., born in December 2016. Rose had a child born in 2008 removed from her care in May 2010 due to unexplained injuries to his lip. Rose later admitted to physically disciplining him. She was provided anger management, individual therapy, and family support services during that case, but had difficulty meeting her case plan goals and ultimately relinquished her parental rights to that child in September 2011.

Additional intakes were received the following month reporting concerns about the family's living environment, Rose's ability to meet Hannah's basic needs, and the fact that Rose had recently relinquished her rights to another child. Hannah was removed from the home, and a juvenile case was opened. Hannah was returned home in November 2013, but the case remained open. The caseworker at that time began to have concerns again in the spring that the children were not being properly supervised and were not clean and sanitary. So Hannah and Ethan were removed in May 2014 but were returned home the following month.

The family came to the attention of the Department of Health and Human Services (DHHS) in the instant case in August 2015 based on reports that the home was very cluttered and Ethan had sustained a head injury for which Rose provided inconsistent information about its cause. An additional report was received later that month indicating that Ethan had been hospitalized for seizures, and there were concerns about Rose's caregiving during the hospitalization.

Hannah and Ethan were removed from the home, and the State filed a petition on September 15, 2015, alleging that they were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). After holding a hearing, the juvenile court adjudicated Hannah and Ethan under § 43-247(3)(a). In December 2016, the State filed a petition to adjudicate Abigail. On January 30, 2017, the State moved to terminate Rose's and Kevin's parental rights to Hannah, Ethan, and Abigail pursuant to Neb. Rev. Stat. § 43-292(2), (5), and (6) (Reissue 2016) and pursuant to § 43-292(7) with respect to the two older children. The State also alleged that termination was in the best interests of the children. The following day, the juvenile court appointed a guardian ad litem for Rose and for Kevin.

The termination hearing was held on April 10 and 11, May 23, and August 15, 2017. Throughout the entirety of the case, Rose's mental health continued to be a concern, as did her unwillingness to accept responsibility for the issues in the case and the condition, cleanliness, and safety of the family's home. These were the same concerns present in the original case involving Hannah in 2011. Initially in the present case, Rose was unwilling to attend counseling, but she did agree to undergo a psychological and parenting evaluation with Dr. John Meidlinger in May 2016. Meidlinger observed that Rose tends to blame other people for her problems, and one of the recurring themes in her life is that nothing is her fault and other people have treated her badly. He found that Rose has an attitude that she is not going to be helped by an intervention, which makes it difficult for her to be receptive to it. She reported to him that she does not believe that counseling is helpful and has had bad experiences with counselors.

Meidlinger observed Rose with Hannah and Ethan and noticed that the children seemed indifferent to her and did not count on her for much. He found that she was emotionally distant with her children and severely lacking in an ability to be playful and engaging with them in a nurturing fashion and is also apt to be resistant to learning alternative ways of parenting. These characteristics place her at a great disadvantage in learning to parent her children, and she is likely to have difficulties being able to enter their lives and knowing how to guide, direct, and interpret their experiences. She is likely to be unpredictable and mercurial in her relationship with them and can be, at times, punitive and harsh. Meidlinger determined that Rose has never developed a pattern of consistency in her own life and will likely continue to be chaotic with the children. He also felt that she never really developed a strong bond of attachment with the children and would have great difficulty managing their behaviors on her own.

Meidlinger's concerns for Rose as a parent were that she had no good role models for parenting growing up and many reasons to be angry with the way she was raised. He concluded that she is likely to repeat her own experiences in her relationships with her children. In addition, she is very much focused on herself and sees the world in terms of what is good for her, so seeing her children as people with their own feelings and having empathy in regard to wanting them to be happy is something that is quite difficult for her. Meidlinger determined that Rose is quite impaired in that area, which will affect her ability to make her children feel that she loves them and that they want to be a part of her family and to go along with her.

Meidlinger ultimately diagnosed Rose with borderline personality disorder, which includes both narcissistic and borderline features, and adjustment disorder with disturbance of emotion and conduct. The narcissism is considered to be a mental illness or disorder, and it is such that it would continue for a prolonged, indefinite period of time. Both disorders suggest long-term patterns of functioning that are difficult to change. Meidlinger noted that Rose had also been diagnosed with narcissistic personality disorder by a different doctor in 2011.

Meidlinger opined that Rose "very much" needs to involve herself in some in-depth counseling to help her understand herself and to develop a greater sympathy for her own history of abuse and loss. He believed that if she could develop some empathy for herself instead of hiding behind her anger, she would be more likely to be able to develop some empathy with her children and to focus on meeting their needs. He observed that she was not indicating any desire to work on improving her relationship with Kevin and reported only staying with him to increase her chances of regaining custody of the children.

Rose began seeing a therapist in August 2016 and continued to do so throughout the remainder of the case. She expressed multiple times, however, that she did not feel that she needed therapy. And it was not until May 2017 that Rose agreed to begin slowly working on her trauma history.

Unfortunately, a continuous theme throughout the case was Rose's refusal to accept responsibility. A DHHS case plan court report dated November 7, 2016, reported that Rose had completed a parenting curriculum and felt like she had nothing she needed to work on and that she had not listened to the family support worker's advice and recommendations at times. In addition, the caseworker assigned to the case from September 2015 through November 2016 acknowledged that Rose regularly attended visitation, but she struggled with redirection and accepting authority

from the family support workers. As of January 2017, DHHS reported that Rose continued to refuse to listen to the family support workers' advice and recommendations and had struggled with adjusting her parenting technique at the encouragement of workers. There were times she would blame DHHS for her current situation or place the blame on Hannah and Ethan for being hard to handle.

Rose began attending child-parent psychotherapy with Hannah in October 2015. Hannah's initial goals were eliminating temper tantrums, reducing her defiance and aggression, and improving the parent-child interactions. The therapist testified at the termination hearing that the intensity, duration, and frequency of Hannah's tantrums, defiance, and aggression had significantly decreased. She also began seeing Ethan in June 2016 when he began having increased tantrums. At the time, Ethan's speech was delayed, and although it had improved, he continued to be below average for his age.

The therapist noted that an important factor for Rose's success with Hannah would be Rose's ability to manage her own anger responses without DHHS supports present and manage her own mental health. She opined that Rose will need to manage her own emotions and triggers and not become emotionally reactive herself in order to meet Hannah's emotional needs. Toward the end of the case, Hannah continued to demonstrate a level of negativity toward Rose and continually expressed a desire not to go on visits. Hannah's foster mother testified that as of the time of the termination hearing, Hannah continued to have tantrums when it was time to leave for visits with Rose. Hannah would run, hide, kick off her shoes, and scream that she did not want to go on visits.

The children's therapist noted that Hannah had spent only 22 months of her life with Rose as her primary caregiver, and she needs a sense of permanency and stability which is important for emotional development and secure attachment. The therapist iterated that all children need consistency, permanency, and stability, and when they do not have that, the chance for longer-term mental health issues increases. Based on her observations of working with the children and Rose, she opined that as of the time of the termination hearing, the children were not yet able to safely return home.

Likewise, the court-appointed special advocate expressed concerns about reunifying the children with Rose. She was concerned because Rose had not maintained safety in the home, had not shown good parenting, and had not done things that a parent needs to do to keep her children from becoming traumatized and requiring therapy. She observed that children need opportunities to grow and be healthy and opined that that would not happen if they were placed back into the same situation from which they were removed.

The current caseworker also testified that she would have concerns about returning the children to Rose's care because Rose overreacts when she gets upset; that there was no explanation for a mark found on Hannah in November 2016, although Hannah indicated that Rose had grabbed her and caused the mark; that Rose has not shown a consistent ability to keep the home safe and sanitary; and that Rose and Kevin continue to fight in front of the children. The caseworker also noted that Ethan was still having difficulty transitioning to visits and having separation anxiety from his foster mother. Both the caseworker and the family support worker believed that the family continued to need help but did not believe there were any additional services that could be provided

to help them achieve reunification. Thus, the caseworker testified that DHHS supported terminating Rose's parental rights based on the length of time the children had been out of home and the lack of progress made during that time.

After the conclusion of the termination hearing, but before the juvenile court entered its order, the children's guardian ad litem filed a motion for ex parte order suspending visitation. The motion alleged that at recent visits, Rose had shown "utter, and complete disrespect" toward the visitation workers such that the children's safety and well-being were placed in jeopardy. The motion also asserted that at a recent visit, Rose became upset, screamed profanities, and grabbed Hannah's arm and pulled her out of a restroom. Rose also allegedly yelled at Kevin, who then confronted the visitation worker. The motion claimed that the actions occurring at visits created anxiety and distress for the children, which, according to their therapist, was not in their best interests. The juvenile court granted the motion, immediately suspending visitation.

Thereafter, the court entered an order on November 17, 2017. The court found sufficient evidence to adjudicate Abigail under § 43-247(3)(a). The court recognized that the present case is the third case involving Hannah and the second case involving Ethan due to the cleanliness and appropriateness of their living environment and unexplained injuries. The court found that as long as Rose and Kevin were fully monitored, they could provide for the basic necessities of the children on a physical level. However, when not fully monitored and assisted, they quickly slide back into their established patterns or behaviors which place the children at risk for harm. The court found that they continued to struggle to maintain the home in a clean and safe manner and struggled to maintain control and supervision of the children. The court observed that Rose and Kevin continued to argue and get aggressive with various support providers and therapists. Additionally, Rose and Kevin continued to display "utter antipathy" toward DHHS, the service providers, and the entire system in which they were forced to work, which impeded their ability to make progress during the case. The juvenile court noted the children's therapist's opinion that the children need stability and permanence but found that "it still appears that any type of reunification with the parents is light-years away."

The court ultimately concluded that the State presented sufficient evidence to support all of the statutory grounds alleged for termination. And the court found sufficient evidence to establish that termination of Rose's and Kevin's parental rights to all of the children was in the children's best interests. Rose appeals, and Kevin attempts to cross-appeal.

## III. ASSIGNMENTS OF ERROR

On appeal, Rose assigns, summarized and renumbered, that the juvenile court erred in finding (1) that statutory grounds exist to support termination, (2) that there was clear and convincing evidence that she was an unfit parent, and (3) that termination of her parental rights was in the children's best interests.

On cross-appeal, Kevin assigns that the juvenile court erred in finding statutory grounds to support termination and in finding termination was in the children's best interests. Kevin has not, however, designated his brief as a cross-appeal as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2014).

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Carmelo G.*, 296 Neb. 805, 896 N.W.2d 902 (2017).

## V. ANALYSIS

### 1. ROSE'S APPEAL

#### (a) Statutory Grounds for Termination

The bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Rose's parental rights, the juvenile court found that the State had proved three of the conditions contained in § 43-292 by clear and convincing evidence, namely subsections (2), (5), and (6). Further, the court found that subsection (7) existed with respect to Hannah and Ethan.

On appeal, Rose does not challenge the court's findings regarding subsections (2), (6), and (7). She therefore concedes these conditions, and upon our de novo review of the record, we affirm the juvenile court's finding that the State sufficiently proved grounds for termination of Rose's parental rights to all three children under § 43-292(2) and to the two older children under § 43-292(7). Our determination is based upon the facts outlined above and our analysis of Rose's unfitness as described below.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010). Therefore, this court need not review termination under § 43-292(5) or (6). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

#### (b) Unfitness and Best Interests

Rose asserts that the juvenile court erred in finding that she was unfit to parent her children and that terminating her parental rights was in the children's best interests. We disagree.

The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court. See *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009). Accordingly, before the State attempts to force a breakup of a natural family, over the objections of the parents and their children, the State must prove parental unfitness. *Id.*

A court may not properly deprive a parent of the custody of his or her minor child unless the State affirmatively establishes that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right. *Id.* It is always the State's burden to prove by clear and

convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. See *In re Interest of Hope L. et al., supra*.

Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. See *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*.

During the present case, Rose showed little improvement in the conditions that led to adjudication. And the same conditions were present in her previous juvenile cases. Although Rose participated in the majority of the services provided to her, she never made the necessary progress in order to allow the children to be safely returned to her care. She was consistently resistant to heeding any advice, attempting to make changes in her parenting, or believing that the services offered were designed to help her. She repeatedly indicated that she did not need therapy and did not believe it was helpful. Rose continued to blame others for the situation in which she found herself and refused to work on addressing her underlying trauma, which was reported to be the cause of her personality disorder and corresponding parenting shortcomings. Despite all of the therapy sessions Rose attended during the case, as of March and April 2017, she continued to struggle to understand how her own trauma history and anger impacted her parenting. It was not until May that Rose agreed to begin slowly working on her trauma.

By that time, however, Hannah and Ethan had already been in an out-of-home placement for 20 months in the present case, and Abigail had been out of home for the entire 5 months of her life. And in total, Hannah had been out of home much longer. Her therapist indicated that Hannah, like all children, needs consistency, permanency, and stability, but as of the date of the termination hearing, in her opinion, the children could not safely return home yet.

Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Unfortunately, Rose has made very little progress on the issues that led to Hannah's initial removal from the home in 2011 and continued throughout the present case, and neither the family support worker nor the caseworker could identify any additional services that could be provided to assist in achieving reunification. We therefore conclude that based on the record before us, the State established by clear and convincing evidence that Rose was unfit and that it was in the best interests of the children that her parental rights be terminated.

### 2. KEVIN'S PURPORTED CROSS-APPEAL

We next address Kevin's purported cross-appeal. Kevin filed a "Brief of Appellee Father - Kevin [W.]" with this court. While assignments of error are made, there is no designation of a cross-appeal. In *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999), the Nebraska Supreme Court refused to address assignments of error in an appellee's brief

not designating a cross-appeal. The court in *In re Interest of Natasha H. & Sierra H.* explained that "the appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee," 258 Neb. at 146, 602 N.W.2d at 451, and "have repeatedly indicated that a cross-appeal must be properly designated, pursuant to rule 9(D)(4), if affirmative relief is to be obtained," 258 Neb. at 145, 602 N.W.2d at 450. Section 2-109(D)(4) provides:

> Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. This division shall be headed "Brief on Cross-Appeal" and shall be prepared in the same manner and under the same rules as the brief of appellant.

Parties wishing to secure appellate review of their claims for relief must be aware of, and abide by, the rules of this court in presenting such claims. *In re Interest of Natasha H. & Sierra H., supra*. Any party who fails to properly identify and present its claim does so at its peril. *Id.* Kevin has not complied with the rules of this court, and we therefore do not address his assignments of error.

## VI. CONCLUSION

We conclude that the State sufficiently proved statutory grounds for termination of Rose's parental rights to Hannah, Ethan, and Abigail and that termination is in the children's best interests. Because Kevin did not properly cross-appeal, we do not address his assignments of error and therefore affirm the termination of his parental rights to the children as well.

AFFIRMED.