IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF STEPHEN H. & AVA H.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF STEPHEN H. AND AVA H.,
CHILDREN UNDER 18 YEARS OF AGE.


STATE OF NEBRASKA, APPELLEE,

V.

MATTHEW H., APPELLANT.


Filed April 19, 2022.    Nos. A-21-698, A-21-699.


Appeals from the County Court for Phelps County: TIMOTHY E. HOEFT, Judge. Affirmed.

Carson K. Messersmith and Charles D. Brewster, of Anderson, Klein, Brewster & Brandt, for appellant.

Natalie G. Nelsen, Deputy Phelps County Attorney, for appellee.

Taylor A. L'Heureux, guardian ad litem.


MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Matthew H. appeals from the orders of the Phelps County Court sitting as a juvenile court, terminating his parental rights to two of his children. Upon our de novo review of the record, we affirm the juvenile court's orders.

## II. STATEMENT OF FACTS

### 1. PRETERMINATION PROCEEDINGS

Matthew is the biological father of Stephen H., born in November 2017; and Ava H., born in March 2019. The children share the same biological mother, Donielle H. Matthew and Donielle were in a relationship at the beginning of the cases at issue, but Donielle is referred to as Matthew's former wife at points later in the record. Our record indicates that Matthew's and Donielle's relationship spanned 10 years. However, our record is unclear as to when Matthew and Doneille ended their relationship and whether they ever cohabitated. Our record references that the State filed motions to terminate Donielle's parental rights to Stephen and Ava, but those filings do not appear in our record. Our record does not indicate whether Donielle's parental rights had been terminated by the juvenile court. Donielle is not a part of this appeal and will be discussed only as necessary.

### (a) Stephen's Adjudication and Disposition

Stephen was removed from Matthew's and Donielle's custody on February 27, 2018, when he was 3 months old, following a report of domestic violence and substance use. A petition was filed later that day to adjudicate Stephen pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on Donielle using a "white crystalline substance" in the presence of Stephen, and Matthew and Donielle being involved in physical domestic violence. On June 21, the State filed an amended petition, adding the allegation that Matthew and Donielle were parties to a prior child welfare case and had failed to correct the issues that had led to adjudication, including domestic violence.

A contested adjudication hearing for Stephen was held on July 2, 2018. While the bill of exceptions from the adjudication hearing is not included in our record, a journal entry filed on the same day reflects that Matthew appeared at the hearing. The journal entry notes that the juvenile court had previously explained the rights, dispositions, and ramifications relevant to the proceedings. Under Matthew's name, the journal entry states, "Party acknowledged understanding the rights, allegations, proceedings and possible dispositions." An order adjudicating Stephen was entered on August 7. He has remained out of the home since he was removed.

The juvenile court entered a dispositional order regarding Stephen on September 12, 2018, adopting the case plan presented by the Nebraska Department of Health and Human Services (the Department). Matthew's case plan goals included (1) addressing his mental health and substance use needs on a continuous and ongoing basis; and (2) providing for his child's basic needs consistently and on an ongoing basis.

### (b) Ava's Adjudication and Disposition

Ava was removed from Matthew's and Donielle's custody on March 18, 2019, when she was 12 days old, following a report from Donielle's mental health providers. A petition to adjudicate Ava pursuant to § 43-247(3)(a) was filed in Buffalo County Court sitting as a juvenile court the following day. We note that Ava's case appears to have been transferred to Phelps County for disposition and subsequent proceedings in both cases occurred in Phelps County. An amended petition was filed on March 22, alleging that the Matthew and Donielle had a history of child welfare cases, domestic violence, and substance abuse, placing Ava at risk of harm. At the time

that Ava was removed from the home, Matthew was participating in residential substance abuse treatment.

An adjudication hearing for Ava was held on June 25, 2019. We likewise do not have the bill of exceptions from Ava's adjudication hearing in our record. However, a journal entry filed on the same day shows that Matthew did not appear at the hearing, though his counsel was present. Our record reflects that Matthew was incarcerated at the time. The juvenile court provided Donielle with a rights advisement at the adjudication hearing. Following Donielle's plea of no contest, Ava was adjudicated during the hearing. She has remained out of the home since she was removed.

The juvenile court entered a dispositional plan regarding Ava on August 19, 2019, adopting an addendum to a case plan the Department had already prepared for Stephen. This case plan, dated August 13, is not included in our record.

### (c) Review Hearings

Our record reflects that several review hearings were held during both cases, occurring on December 12, 2018; May 13, 2019; August 19, October 23, January 22, 2020; and May 4, August 10, November 30, and March 8, 2021. The case plans contained the same two goals for Matthew as were in the initial dispositional case plan in Stephen's case; (1) addressing Matthew's mental health and substance use needs on a continuous and ongoing basis; and (2) providing for his children's basic needs consistently and on an ongoing basis.

### (d) Motions for Termination

On December 1, 2020, the State filed motions to terminate Matthew's parental rights in regard to Stephen and Ava; alleging statutory grounds to terminate existed pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016), and alleging that termination was in the best interests of the children. As noted above, our record notes that the State also filed motions to terminate Donielle's parental rights in regard to Stephen and Ava.

At a hearing on December 21, 2020, the juvenile court provided Donielle with another rights advisement in anticipation of the termination hearing. Matthew was to appear at the hearing by phone, but multiple calls to his phone went unanswered. The court informed Matthew's counsel that Matthew needed to be advised of his rights, which could be achieved either by Matthew appearing before the court or by Matthew signing and filing a written acknowledgement of his rights. Matthew's counsel responded, "I'll see if I can get him to do that, Judge. We didn't do that this time because of timing. And we'll get the requirements satisfied for you." A written acknowledgment of Matthew's rights does not appear in our record.

### 2. TRIAL

The termination trial was held over the course of 2 days in April 2021. At the trial, 14 witnesses testified and 40 exhibits were received by the juvenile court.

### (a) Prior Child Welfare Case

Matthew testified that he was the father of seven children. He had been involved in a prior child welfare case involving two of his other children, which resulted in Matthew relinquishing his parental rights to the involved children.

Sheri Blaha, a licensed independent mental health practitioner, facilitated child-parent psychotherapy (CPP) in 2016 for Matthew's prior child welfare case. Blaha testified that both children involved in the case displayed signs of trauma caused by witnessing domestic violence between Matthew and Donielle. Blaha also described an incident when Matthew disrupted a visit between one of the children and Donielle, which he was not permitted to attend. Blaha found this concerning, as Matthew had been instructed to follow the visitation rules and Matthew, instead, chose to disregard the emotional safety of the child. Blaha testified that at the end of the case, none of her concerns regarding Matthew had been resolved, including addressing the domestic violence in the home.

### (b) Criminal Charges and Incarceration

Matthew had also been arrested in a criminal case involving another of his children, though he could not recall the charges or the sentence he served as a result of the conviction. Court records submitted into evidence show that Matthew pled guilty in August 2018 to child abuse and third degree assault. He was sentenced in January 2019 to serve 180 days in county jail with credit for 62 days served.

Additionally, Matthew testified to being charged in 2018 with possession of a controlled substance, operating a motor vehicle to avoid arrest, and willful reckless driving. Court records submitted into evidence show that Matthew pled no contest to the above charges, and was sentenced in April 2019 to a term of 24 months' imprisonment and 12 months' post-release supervision.

Various reports and records reflect that since the cases began in February 2018, Matthew has spent over 375 days incarcerated.

### (c) Case Plan Goals and Services

Matthew testified that he had never seen the dispositional case plans and was unsure if his case plan goals had remained the same throughout the current cases. When presented with multiple case plans, Matthew conceded the plan goals were identical, but maintained that he had never seen the goals before.

Ashley Salinas was the Department caseworker assigned to the current cases from approximately March 2018 until September 2019. She testified to reviewing the case plan with Matthew at the start of Stephen's case during a family team meeting. Salinas described the services offered to Matthew, including family support, parenting time supervision, and support for his mental health and substance use needs. Department court reports reflect that Matthew was required to complete a parenting class, as well as any other recommendations generated by his May 2018 substance use evaluation. Recommendations of the substance use evaluation included the "Stages of Change" class, a domestic violence intervention program, and medication counseling.

When Salinas left the cases in September 2019, Matthew had completed an individual diagnostic interview but had not completed the "Stages of Change" curriculum or a domestic violence intervention program. Matthew also did not complete the parenting class he had started. When asked to identify the barriers to Matthew's participation in services, Salinas responses, "Honestly, himself." Salinas testified that Matthew worked minimally with family support workers

and that Matthew had not made any progress on his rehabilitative plan while she was his caseworker.

Salinas described communication barriers with Matthew, including his refusal to talk to her, lack of attendance at family team meetings and other scheduled appointments, and yelling at Salinas on the occasions they did have contact.

Rebecca Konate has been the Department caseworker assigned to the cases since September 2019. Konate testified that Matthew has never worked with family support because Matthew had already established his employment and housing when was released from prison in March 2020. Matthew also declined the gas vouchers offered by the Department and Konate described his finances as "stable."

At the time of trial, Matthew had yet to complete a parenting class. Additionally, Matthew had never signed a release for the Department to communicate with his medication provider, so Konate was unable to say whether Matthew was medication compliant.

### (d) Substance Use

Salinas testified that Matthew was required to comply with random drug testing. While Salinas offered weekly tests, in the span of 1 year, Matthew completed only six tests, all of which were positive for methamphetamine.

Records submitted into evidence show that Matthew spent over 35 days in residential treatment during February and March 2019. Matthew testified that he relapsed shortly after his discharge from residential treatment and records reflect he tested positive for methamphetamine roughly 1 week after his discharge. However, Matthew stated he enrolled in intensive outpatient treatment in March 2020. Records demonstrate that Matthew successfully completed intensive outpatient treatment between March and May and successfully completed outpatient treatment between May and July.

Matthew's probation officer testified that Matthew was randomly drug tested at least once a week from March 2020 to March 2021. Matthew did not have any positive drug tests during his year of probation.

After Matthew was released from probation in March 2021, Konate testified that the juvenile court ordered that Matthew participate in drug testing through the Department. At the time of the trial, the Department had facilitated five drug tests. Four of the tests were negative and one test was positive for "PCP," which Matthew reported to Konate was caused by his exposure to diatomaceous earth.

### (e) Visitation and CPP

Matthew testified that from the time Stephen's case began in February 2018 until he was incarcerated in April 2019, he attended most of his scheduled visits with Stephen. However, Salinas reported that Matthew did not consistently participate in visitation, as he would cancel visits or confirm visits but then not attend. Visits during this period remained supervised and in the community, rather than in Matthew's home, due to the Department's concerns of domestic violence, methamphetamine use, and Matthew's ability to meet Stephen's basic needs.

Matthew testified that he was in residential treatment at the time of Ava's birth in March 2019, and had no contact with her before he was incarcerated a month later. During the year he was incarcerated, Matthew did not have any contact with Stephen or Ava.

After Matthew was released from prison in March 2020, he was required to have therapeutic visits with Stephen and Ava through CPP. Konate testified that a lack of providers and disruptions caused by the COVID-19 pandemic delayed the start of Matthew's CPP.

Jody Johnson, a licensed independent mental health practitioner, began working with Stephen when he was 17 months old. She likewise testified that when Matthew was released from prison in March 2020, she was offering only telehealth services due to the COVID-19 pandemic. Johnson did not believe that performing CPP over telehealth would be effective, given the children's young ages and the fact that Johnson had not yet completed a parental relationship assessment for Matthew.

Johnson further testified that based on her work with Stephen and Ava from April 2019 through March 2020, the children's removal, custody, and placement in foster care had created a disruption in the attachment relationships. She noted the risks of not restoring a sense of safety and security to the children included ongoing mental health concerns.

Konate testified that Matthew began CPP with Stephen and Ava in September 2020 with a new provider, as Johnson had not resumed in-person sessions in the fall of 2020. At the time of trial, thirty CPP sessions had been scheduled, and eleven of those sessions had been missed. Konate attributed five missed sessions to Matthew having car problems or being sick, and the other six to severe weather or COVID-19 exposures unrelated to Matthew. Konate stated that while the children's current therapist had not yet recommended extending Matthew's visitation beyond CPP, all of the current therapist's reports regarding CPP had been positive.

The children's foster mother, who has had placement of the children since Stephen was 5 months old and Ava was 2 weeks old, testified that the children began displaying new behaviors when visits between Matthew and the children began in the fall of 2020. Ava became very clingy and wanted to be held for the rest of the night following visits with Matthew. Stephen became more defiant and would not take direction from his foster mother. Stephen also had trouble falling asleep in the evenings following visits with Matthew. The foster mother testified that the children's behaviors subsided during December 2020, when a 5-week break from CPP with Matthew occurred. She described the children as more relaxed, better listeners, happier, and more outgoing during this 5-week period. However, after CPP resumed, so too did the children's behaviors.

(f) Psychological Evaluations

Dr. John Meidlinger, a clinical psychologist, has conducted psychological evaluations for Matthew on three separate occasions; in 2006, 2016, and 2021. Meidlinger testified that based on his first two evaluations, in 2006 and 2016, he diagnosed Matthew on both occasions as meeting criteria for bipolar disorder, intermittent explosive disorder, and a personality disorder. Meidlinger defined intermittent explosive disorder as a historical pattern of poor impulse control reflected in violent or aggressive behaviors toward others. In his 2006 and 2016 evaluations, Meidlinger saw Matthew as someone who was "self-centered" and observed that much of Matthew's violent behavior had been in the context of his domestic relationships.

Meidlinger's most recent psychological evaluation of Matthew occurred a few weeks before the termination trial. Based on his 2021 evaluation, Meidlinger diagnosed Matthew with a substance use disorder in remission, intermittent explosive disorder, and a personality disorder with dependent and narcissistic features. Meidlinger recommended that Matthew receive ongoing counseling and potentially medication to manage his disorders.

Meidlinger testified that he did not believe Matthew was in a position to be a full-time parent, as Meidlinger felt that Matthew needed to demonstrate a period of stability for at least 1 year before the court should consider reunifying Matthew with his children. Meidlinger noted that Matthew had long-standing patterns and that, should those patterns continue, the children were at risk of being victims to Matthew's anger.

Meidlinger identified Matthew's intellectual limitations, ability to maintain sobriety, and ability to demonstrate impulse control as Matthew's major barriers to effective parenting. In Meidlinger's 2021 evaluation he stated,

> I did not note any problems with Matt's behavior when I saw him with his children in 2006. He appeared to have adequate parenting skills and was able to spend a positive hour with his two older children. My concerns about Matt in regard of parenting have always been his capacity for maintaining emotional stability and self-control. He reports that he is no longer using drugs and that has made all the difference in his life. However, he has a history of violent and aggressive behavior going back to adolescence and a strong tendency to deny and avoid accepting responsibility for his own role in difficulties.

(g) Domestic Violence

Salinas testified to a vicious cycle in terms of Matthew's domestic violence with Donielle. Salinas stated that while she was the family's caseworker, Donielle filed for a protection order and reported that Matthew was stalking her.

Jordan McCoy, a licensed mental health therapist, began seeing Donielle for weekly sessions beginning in October 2018. In sessions with McCoy, Donielle expressed concerns regarding Matthew's parenting, including Matthew's inability to understand the impact of the domestic violence on the children and their emotional needs. Donielle had reported domestic violence spanning the entirety of the relationship between herself and Matthew, and McCoy testified that she was concerned for the children. McCoy explained that children who have witnessed ongoing domestic violence have a heightened stress-response system, which can impact their brain development and can create deficits in their social and emotional functioning. Children who are exposed to ongoing domestic violence also exhibit symptoms such as excessive worrying, bed-wetting, headaches, and stomachaches.

Jasmine H., Matthew's 17 year old daughter, testified that when she was living with Matthew in December 2020, "[m]y father got physical with me, hit me and put his hands over my mouth and nose." Jasmine stated that the altercation began after Matthew accused Jasmine and her friend of stealing art supplies from Matthew's girlfriend, Melissa M., who was also living with Matthew at the time. Jasmine could not recall how many times Matthew had hit her, but did state that he caused her face to bleed. Jasmine estimated that Matthew had his hands over her mouth and nose for 1 minute, making it difficult for her to breathe. Matthew then received a phone call

and told Jasmine if she was not quiet, he would kill her. Jasmine testified that after the phone call, Matthew calmed down and asked her to forgive him, which she did so that "he wouldn't do it again."

Jasmine testified she later made a report about the incident to law enforcement and moved out of Matthew's home. A law enforcement report entered into evidence reflects that Matthew was arrested for assault by strangulation and terroristic threats on March 1, 2021, but the date of Jasmine's initial report of the incident is unclear. The law enforcement report notes that Melissa witnessed "Matthew slap Jasmine in the face until she bled and also place his hand over Jasmine's nose and mouth to try to keep her from crying and making noise." When asked why Jasmine did not report the incident to law enforcement immediately, she stated that she did not want to make Matthew "any more mad."

Jasmine testified that Matthew had never been physical with her before, but had been physical with Donielle and with Jasmine's brother, whom Matthew pled guilty to assaulting in 2018. Jasmine stated that she had witnessed Matthew hit and choke Donielle multiple times. Melissa also reported to law enforcement that, during the alleged incident with Jasmine, Matthew shouted to Jasmine, "I'm gonna beat you like Donnell [sic]."

Testimony was then given by Jasmine's mother and Jasmine's grandmother, who testified to Jasmine fabricating allegations of physical abuse in the past. Matthew invoked his right against self-incrimination and did not testify regarding the alleged incident with Jasmine.

Konate testified that the Department had received an intake that was related to Matthew and the alleged incident with Jasmine.

### (h) Need for Additional Services

Konate testified that the Department had received nearly 40 intakes regarding Matthew over 20 years and that she found that number concerning. Konate did not believe it would be in the children's best interests to be returned to Matthew's care due to Matthew's overall lack of progress with case plan goals. Before she could recommend reunifying the children with Matthew, Matthew would need to complete the required courses, continue to have negative drug tests, and sign a release so that Konate would be able to discuss Matthew's medications with his provider. Konate noted that her recommendation for reunification also depended on Matthew utilizing the skills learned in his classes with his children.

### (i) Character Witnesses

Testimony was also heard from two character witnesses who met Matthew when he attended bible study while incarcerated. Matthew continued attending Bible study and services at the witnesses' church after he was released. Matthew was described as "very forthright and honest" in addition to being a stable person and a good father.

### 3. Termination Orders

Following the termination hearing, the juvenile court entered orders on August 3, 2021, terminating Matthew's rights to Stephen and Ava. The court found that the State had met its burden of proving substantial and continuous neglect, and that the children had been in out-of-home placement for 15 or more months out of the most recent 22 months pursuant to § 43-292(2) and

(7). The court also found that pursuant to § 43-292(6), Matthew also failed to correct the conditions that led to the children being adjudicated under § 43-247(3)(a). The court further found that it was in the best interests of the children to have Matthew's parental rights terminated.

Matthew appeals.

## III. ASSIGNMENTS OF ERROR

Matthew assigns, restated, that the juvenile court erred by (1) failing to inform him of his rights in the termination proceedings as required by Neb. Rev. Stat. § 43-279.01 (Reissue 2016) and the Due Process Clause and (2) finding that he had failed to comply with the court ordered rehabilitative plan.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

## V. ANALYSIS

### 1. RIGHTS ADVISEMENT

Matthew claims that "[a]bsent from the record is any showing that [he] was ever fully advised of his rights." Brief for appellant at 6. He argues the juvenile court's failure to inform him of his rights is a violation of both § 43-279.01 and the Due Process Clause, and thus the termination of his parental rights was improper.

Section 43-279.01 provides:

(1) When the petition alleges the juvenile to be within the provisions of subdivision (3)(a) of section 43-247 or when termination of parental rights is sought pursuant to subdivision (6) of section 43-247 and *the parent, custodian, or guardian appears with or without counsel, the court shall inform the parties* of the:

(a) Nature of the proceedings and the possible consequences or dispositions pursuant to sections 43-284, 43-285, and 43-288 to 43-295;

(b) Right of the parent to engage counsel of his or her choice at his or her own expense or to have counsel appointed if the parent is unable to afford to hire a lawyer;

(c) Right of a stepparent, custodian, or guardian to engage counsel of his or her choice and, if there are allegations against the stepparent, custodian, or guardian or when the petition is amended to include such allegations, to have counsel appointed if the stepparent, custodian, or guardian is unable to afford to hire a lawyer;

(d) Right to remain silent as to any matter of inquiry if the testimony sought to be elicited might tend to prove the party guilty of any crime;

(e) Right to confront and cross-examine witnesses;

(f) Right to testify and to compel other witnesses to attend and testify;

(g) Right to a speedy adjudication hearing; and

(h) Right to appeal and have a transcript or record of the proceedings for such purpose.

(Emphasis supplied.)

Parents have a recognized liberty interest in raising their children. *In re Interest of Aaliyah M. et al.*, 21 Neb. App. 63, 837 N.W.2d 98 (2013). The parent-child relationship is afforded due process protection. *Id*.

This court has stated that § 43-279.01

protects parents' liberty interests in raising their children by ensuring that a parent who is brought into court for a juvenile proceeding knows what is going on; knows all the possible outcomes of the case, including drastic measures such as termination of parental rights; and understands the rights that may be exercised during the case.

*In re Interest of Aaliyah M. et al.*, 21 Neb. App. at 69, 837 N.W.2d at 102.

(a) Rights Advisement in Stephen's Case

We do not have a bill of exceptions from hearings held during the adjudication phase of Stephen's case. However, a journal entry from Stephen's adjudication hearing on July 8, 2018, indicates that Matthew was present at the hearing, was represented by counsel, and acknowledged his understanding of the rights, allegations, proceedings, and possible dispositions concerning Stephen's child welfare case. This journal entry was received as an exhibit without objection during the termination trial. The record indicates that at the start of the termination phase for both children, the juvenile court gave another rights advisement during a hearing on December 21, 2020, for which Matthew was not present.

It is the responsibility of the party appealing to provide a record which supports the claimed errors. *In re Interest of Ty M. et al.*, 265 Neb. 150, 655 N.W.2d 672 (2003). Matthew has failed to provide a record from the adjudication hearing which supports his assertion that he was not properly advised prior to the adjudication of his rights and the possible consequences of termination of his parental rights. The journal entry detailing Stephen's adjudication hearing notes that the juvenile court had previously explained Matthew's rights in the proceedings and that Matthew had acknowledged those rights. Nothing in the record presented to this court indicates that this rights advisement did not comply with the requirements set forth in § 43-279.01.

Furthermore, § 43-279.01 requires that the rights advisement be given at either the adjudication phase or the termination phase, but does not require that the advisement be given at both phases. See *In re Interest of Aaliyah M. et al., supra*. The record before us shows that Matthew was present for the rights advisement given by the juvenile court at the adjudication phase in Stephen's case. Thus, Matthew's due process rights were not violated in Stephen's case.

(b) Rights Advisement in Ava's Case

Turning now to Ava's case, Matthew asserts that the record "is clear that [he] was not present for the reciting of rights during the adjudication phase of [sic] the termination proceeding." Brief for appellant at 9. We agree that the record demonstrates that Matthew was not present for

the juvenile court's rights advisement during Ava's adjudication hearing on June 25, 2019, or the hearing on December 21, 2020, prior to the termination phase for both children.

However, this court has previously determined that the parent must actually be present in court for § 43-279.01 to apply. See *In re Interest of Maxwell T.*, 15 Neb. App. 47, 721 N.W.2d 676 (2006) (finding that the plain reading of the statute language "with or without counsel" indicates that the parent must actually be present in court for the statute to apply and that appearance by counsel alone does not trigger the statute). Matthew was not provided with a rights advisement during Ava's adjudication phase or termination phase, not because advisements were not given by the juvenile court on both occasions, but because Matthew was not present at those specific hearings. Therefore, § 43-279.01 is not applicable to the present situation and the juvenile court did not err in terminating Matthew's parental rights before he was provided a rights advisory pursuant to § 43-279.01.

However, Matthew also argues that the juvenile court's failure to inform him of his rights is a violation of the Due Process Clause. Matthew cites to *In re Interest of Joshua M.*, 256 Neb. 596, 591 N.W.2d 557 (1999) and asserts that while a juvenile court may proceed with a hearing on the termination of parental rights without a prior adjudication hearing, where such termination is sought under certain provisions of § 43-292, the proceedings must "be accompanied by due process safeguards, as statutory provisions cannot abrogate constitutional rights." Brief for appellant at 9.

The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection. *Id*. While the concept of due process defies precise definition, it embodies and requires fundamental fairness. *Id*. State intervention to terminate the parent-child relationship must be accomplished by procedures meeting the requisites of the Due Process Clause. *In re Interest of Mainor T. & Estela T., supra*.

Matthew correctly asserts that he is entitled to procedural due process in connection with the termination of his parental rights proceeding. In the context of both adjudication and termination hearings, the Nebraska Supreme Court has stated that

> [p]rocedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker.

*In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 906-07, 782 N.W.2d 320, 326 (2010), quoting *In re Interest of Mainor T. & Estela T., supra*.

Matthew had notice of the motion to terminate his parental rights as well as the termination hearing. He was represented by counsel throughout the entirety of both cases. Matthew appeared and was advised of his rights at Stephen's adjudication hearing. Matthew's counsel appeared at all hearings, including those for which Matthew was not present. He was given a full evidentiary termination hearing with a reasonable opportunity to refute or defend against the accusations and

a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence. His counsel cross-examined all the State's witnesses and had the opportunity to present evidence. His counsel exercised this opportunity by presenting both witnesses and exhibits to the juvenile court. Matthew provided testimony on his own behalf. Matthew does not allege, nor is there any indication, that the judge was not impartial.

The record is clear that Matthew was not provided with a rights advisement during Ava's adjudication phase or termination phase. However, because Matthew was afforded due process in connection with the termination of parental rights proceedings, Matthew's due process rights were not violated in Ava's case. Thus, this assignment of error fails.

## 2. STATUTORY GROUNDS FOR TERMINATION

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 42-292(2), (6), and (7). Matthew challenges only the juvenile court's finding that he had failed to comply with the court ordered rehabilitative plan, which corresponds to § 42-292(6). However, because we find that another statutory ground supports the termination of his parental rights, we need not specifically address this assigned error.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Here, it is undisputed that the children have been in out-of-home placement for 15 or more months of the most recent 22 months. Stephen was removed from Matthew's home on February 27, 2018, and Ava was removed from Matthew's home on March 18, 2019. The State filed its motion for termination of parental rights on December 1, 2020, and the termination trial was held in April 2021. The children remained out of the home since their respective removals in February 2018 and March 2019. At the time of trial, Stephen and Ava had been out of the home for 37 months and 24 months, respectively. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Matthews's parental rights exists. Thus we do not examine Matthew's second assigned error; that the juvenile court erred in finding he had failed to comply with the court ordered rehabilitative plan under § 43-292(6). See *In re Interest of Carmelo G.*, 296 Neb. 805, 896 N.W.2d 902 (2017) (An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it). However, we will consider evidence relevant to § 43-292(2) and (6) in our analysis of best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will

also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

### 3. BEST INTERESTS AND UNFITNESS

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra.* There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id.* This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquires. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al., supra.* In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *Id.*

Testimony and exhibits offered at the termination trial evidence that Matthew has had some success in treating his addiction to methamphetamine. Since his release from prison in March 2021, Matthew has not tested positive for methamphetamine on any drug test provided by his probation officer or the Department. Matthew successfully completed intensive outpatient treatment in May 2020 and outpatient treatment in July 2020. Nevertheless, concerns remain regarding his ability to ensure the children's safety upon reunification.

Matthew failed to complete a parenting class and other required courses. Reports indicated that Matthew was making positive progress in CPP. However, the children's therapist had not yet recommended visitation beyond the CPP sessions. Despite the length of time the cases have been pending, Matthew had not progressed to the point where he was able to have visitation at his home or without supervision. We acknowledge that Matthew was delayed in starting CPP due to a lack of providers and the COVID-19 pandemic. But this lack of progress can also be attributed, in part, to the year Matthew was incarcerated and was unable to participate in services or visitation with his children. Although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *In re Interest of Jahon S.*, 291 Neb. 97, 98, 864 N.W.2d 228 (2015).

The biggest barrier to reunification is Matthew's inaction in breaking his patterns of domestic violence. Case professionals testified to a long-standing history of domestic violence between Matthew and the children's mother, Donielle. Matthew's children involved in a prior child welfare case displayed signs of trauma caused by witnessing domestic violence between

Matthew and Donielle. It appears that Matthew had failed to address the domestic violence in the home before he relinquished his rights to these other children.

Donielle expressed concerns to her therapist in the current cases regarding Matthew's inability to understand the impact of the domestic violence on the children and their emotional needs. Should Stephen and Ava witness ongoing domestic violence, they are at risk of developing a heightened stress-response system, which may impact their brain development, as well as their social and emotional functioning.

As Meidlinger noted in his recent psychological evaluation, if Matthew's current patterns continue, Stephen and Ava themselves are at risk of being victims to Matthew's anger. Evidence was presented that Matthew's other children had already become victims of his domestic abuse, including Matthew's guilty plea in August 2018 to child abuse and third degree assault related to another son. At the time of the termination trial, Matthew was facing charges of assault by strangulation and terroristic threats related to his daughter, Jasmine. Yet Matthew failed to complete a domestic violence intervention program or otherwise demonstrate that he was working to break his violent patterns.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Matthew's behavior over the course of the cases, and based on the recent allegations of domestic violence and his failure to complete a domestic violence intervention program, he is unlikely to change in the future. The case plan goals have remained consistent throughout both cases and have not been met, and there has been no improvement in Matthew's ability to parent.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Stephen and Ava have been in foster care since their removal in February 2018 and March 2019, respectively. They deserve stability in their lives and should not be suspended in foster care when Matthew is unable to rehabilitate himself and show that he is able to provide a safe environment for his children. Accordingly, we find there was clear and convincing evidence to show that Matthew was unfit and that terminating his parental rights was in the children's best interests.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Matthew's parental rights existed under § 43-292(7) and that termination of his parental rights is in the children's best interests. Accordingly, the juvenile court's orders are affirmed.

AFFIRMED.